WILLIAM M. MERCER, INC. and
Marsh & McLennan Company,
Appellants,

v.

Peggy WOODS, C.R.N.A.,
Appellant/Appellee,

v.

GLACIER GENERAL ASSURANCE
COMPANY, Appellee.

No. 9427.

Court of Appeals of Texas,
Texarkana.

Aug. 12, 1986.

Rehearing Denied Sept. 9, 1986.

R. Brent Cooper, Cowles & Thompson, Dallas, for appellants.

Alan Loewinsohn, Law Offices of Frank L. Branson, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and CHADICK, JJ.*

---

* Honorable T.C. Chadick, Justice, Supreme Court of Texas, Retired, sitting by assignment.

PER CURIAM.

William M. Mercer, Inc. and Marsh & McLennan Company appeal an adverse judgment in a suit involving the failure to provide professional liability insurance to Peggy Woods, a nurse, and violations of the Deceptive Trade Practices Act and the Insurance Code. Woods originally filed a limited appeal focusing mainly on the issues of exemplary and treble damages, and she now brings some of these same points through cross-points in Mercer's and Marsh & McLennan's appeal. Woods, Mercer, and Marsh & McLennan all appeal the granting of a judgment non obstante veredicto in favor of Glacier General Assurance Company.

The significant issues raised include the statutes of limitations for negligence, misrepresentation and deceptive trade practices; the determination of actual damages as a matter of law for failure to provide professional liability insurance; the trial court's refusal to submit requested special issues on contributory negligence; the trial court's refusal to inform the jury of the court's legal interpretation of the insurance policy; the sufficiency of the evidence to support various jury findings; and the granting of a motion for judgment n.o.v. in favor of Glacier.

Woods was a nurse anesthetist at Good Shepherd Hospital in Longview. She was a member of the American Association of Nurse Anesthetists (AANA). As a benefit of this membership, she was entitled to obtain various types of insurance coverage, including professional liability insurance.

Marsh & McLennan administered the insurance program for the AANA. Mercer is a wholly-owned subsidiary of Marsh & McLennan, and was the administrator for the AANA account. From 1975 through the first quarter of 1978, the AANA professional liability insurance program was placed with Glacier General Assurance Company.

Good Shepherd Hospital obtained and paid for professional liability insurance for nurse anesthetists working there. The hospital would make payments for the nurses and handle other dealings with the insurance agency representing the group. These tasks were principally handled by Dwayne Benefield, the Assistant Administrator of Physical Services. In November 1977, he applied to Mercer for insurance for several nurses, including Woods. Woods's policy covered the period from November 20, 1977 to February 20, 1978, and her policy was later renewed to May 20, 1978. This policy was a "claims-made" policy, which covers occurrences which may give rise to a claim that come to the attention of the insured and are made known to the insurer during the policy period. The liability limit was $100,000.00 per occurrence.

Glacier ceased to be the carrier for the AANA account at the end of the first quarter of 1978; the policy was not renewed at the request of AANA. The AANA account was placed with a different insurance carrier. The new insurance program provided an "occurrence" policy, which covers all claims based on an event occurring during the policy period, whether or not the claim or occurrence itself is brought to the attention of the insured or made known to the insurer during the policy period.

The transition from a claims-made policy to an occurrence policy created a potential gap in coverage. There could be claims in which the occurrence giving rise to the claim happened during the time period covered by the claims-made policy, but the insurer was not notified of the occurrence until after that period—such a claim would not be covered by either the first, claims-made policy or the second, occurrence policy. To bridge this gap, Glacier provided an opportunity in its policies for insureds to purchase "tail coverage," which essentially extends the period of the claims-made policy to allow additional time to make claims that are based on injuries that occurred during the initial policy period.

Mercer was authorized to collect premiums for Glacier. During the initial stages of the Glacier program, Mercer was given some latitude in the date of acceptance for premium payments. On December 22,

1977, Benefield contacted a representative of Mercer concerning the payment of premiums due on December 23 and was advised by her that the payment would be accepted if he mailed it on December 22, the day before the due date. Relying on that statement, Benefield mailed the payment on December 22, 1977, and Mercer accepted it, although it was actually received by Mercer beyond the December 23 due date. In February 1978 Benefield sent a premium to Mercer on the 2nd, which was due on the 3rd, and sent premiums to Mercer on the 17th, which were due on the 20th. Mercer accepted these premiums.

A different procedure was used in the collection of premiums for tail coverage. However, Mercer also showed some flexibility in these procedures, until February 1978. By a letter dated February 21, Glacier indicated to Mercer that the policy terms were to be strictly enforced, stating that Glacier would not issue any tail endorsements after thirty days from the expiration date of the policy and rejecting a number of tail endorsement applications forwarded by Mercer.

The policy provision that deals with obtaining tail coverage states:

> In the event of termination of insurance either by non-renewal or cancellation of this policy, or termination of a reporting period the Insured shall have the right upon the payment of an additional premium (to be computed in accordance with the Company's rules, rates, rating plans and premiums applicable on the effective date of the endorsement) to have issued an endorsement(s) providing additional REPORTING PERIOD(S) in which claims otherwise covered by this policy may be reported. Such rights hereunder must, however, be exercised by the Insured by written notice not later than thirty (30) days after such termination date.

Mercer interpreted the terms of the policy to require that both the application and the premium be received before the expiration of thirty (30) days after the expiration of the policy. The trial court agreed with Mercer's interpretation, granting a motion for partial directed verdict on this issue. The memorandum agreement between Glacier and Mercer stated that the initial premium or down payment should accompany each application. The Mercer procedural manual sent to Glacier also indicated that no endorsement could be issued until the premium was received.

In April 1978 Mercer sent a letter to those nurses whose policies expired in May, including Woods. The letter began:

> On May 20, 1978 your Professional Liability Insurance sponsored by the American Association of Nurse Anesthetists is due for renewal. The following information should be read *VERY CAREFULLY* so that you are fully aware of the new procedures: ....

In regard to the change-over in insurance companies, and the resulting gap in coverage, the letter provided:

> 5. Since Glacier General's policy was on a "claims-made" basis there is an option available upon termination. To remind you of the meaning "claims-made"; remember, any claim which has not been reported to the company by May 20, 1978 will not be covered. Therefore, when your Glacier General policy terminates there will be no coverage for any incident which may have occurred during your coverage with them, unless it has been previously reported.
>
> For those of you who are unsure as to your past experience, an Unlimited Discovery Period endorsement is available. This endorsement will extend your reporting period and allow you to file a claim with Glacier General any time after the expiration date of May 20, 1978 for any incident which may have occurred during the Glacier policy period.
>
> 6. The cost of the endorsement is 35% of the aggregate premiums you have paid since the inception of your Glacier General policy.
>
> We will be glad to calculate your premium for this endorsement upon re-

quest. Please complete the enclosed form and return it with your renewal application. If you choose to purchase the endorsement an invoice will be sent. The endorsement must be purchased by June 20, 1978 in order to comply with the terms of the policy.

Woods attempted to obtain the tail coverage offered in the letter. She signed the application and gave it to Benefield, who in turn mailed it to Mercer on May 16, 1978. Mercer received the application on May 18. Benefield sent Mercer a check for the premium on the tail endorsement on June 19. Mercer received the check on June 21, one day after the designated deadline of thirty days after the expiration of the policy. When Woods failed to make timely payment, Mercer did not forward her application to Glacier. Mercer informed the hospital by a letter of June 23 that the payment was late and thus Mercer could not comply with the request for tail coverage. The check sent by the hospital as payment for the tail coverage was returned with this letter. Benefield contacted Mercer by phone about the rejection and was informed that Glacier had requested that Mercer not accept any payments for tail coverage received after the due date.

Earlier, on February 8, 1978, Woods administered anesthesia to Ena Bassham while Bassham was in childbirth. Apparently in part as a result of Woods's negligence in the administration of the anesthesia, Bassham died on February 24, 1978. No notice of the incident involving Bassham's death was given to either Mercer or Glacier by Woods or the hospital in February 1978. Indeed, no notice was given by either Woods or the hospital of the Bassham incident before Woods's policy expired on May 20, 1978.

The notice provision of the policy states:

It shall be the unconditional duty of the Insured as a condition precedent to any duty of the Company hereunder:

A. To immediately report to the Company any occurrence existing as the result of the rendering or failure to render professional services by the insured which may give rise to a claim or lawsuit against the Insured as soon as the Insured shall become aware of such occurrence. The insured shall make such report to the company by way of United States registered mail addressed to the Company at its above address. The Company shall not be deemed to have been notified thereof until it receives such written report. Such report shall state the name and address of such claimant, the date on which the possible claim arose, the names of any witnesses to said occurrence and a narrative summary of the nature of the incident giving rise to such possible claim.

It is unquestioned that if Peggy Woods had given notice to Glacier as required by the policy, coverage would have been available to her under the original policy which covered the period from November 1977 to May 20, 1978. Under such circumstances, tail coverage would not have been involved. However, because Woods and the hospital gave no notice during the policy period, tail coverage was the only remaining source of coverage for the Bassham incident.

By a letter dated October 27, 1978, notice of suit was given to the hospital by counsel for the Basshams. On November 10, 1978, a demand for coverage and a defense for Woods was made by counsel for the hospital to Mercer and Glacier. Mercer informed counsel for the hospital by a letter of November 17 that Woods had not purchased tail coverage, so that Glacier would not be liable for the Bassham claim and no defense to that claim would be provided.

Suit was filed in federal court against Woods, the hospital, and the physician involved in the Bassham incident. A courtesy defense was provided to Woods by the insurer for the hospital; Michael Dunn, a Longview attorney, was representing her, but was employed by The Hartford. In early 1981 the claims against the physician and hospital were settled. The physician settled for $200,000.00 and the hospital settled for $235,000.00. The settlement agreement with the hospital stated that Bassham's death probably resulted from the

combined negligence of the physician involved and Woods, while the settlement agreement with the physician stated that Bassham's death probably resulted from the negligence of Woods alone. Both settlement agreements included specific references to Woods's conflict with Glacier as to coverage. Both agreements also stated that if any recovery was ever made against Glacier in which the Bassham plaintiffs had a right to share, the physician and hospital, along with their insurance carriers, were entitled to recover $25,000.00 and $103,000.00, respectively, out of such recovery.

The suit against Woods was tried without a jury before Judge Joe Fisher on March 10, 1981. During trial, counsel for the Basshams passed Woods a note stating:

> After Judgment its (sic) entered it is my intent to enter into an agreement not to execute on N. Wood personal assets in return for an assignment of her cause of action against her insurance carrier for bad faith and negligent refusal to settle and negligent refusal to defend.

On the eve of trial, an offer was made by the Bassham plaintiffs to Michael Dunn to settle the case for less than $100,000.00. This offer was not communicated to any of the defendants in the present case. The judge found against Woods in the amount of $1,209,016.59, plus postjudgment interest and costs.

After judgment, Woods entered into a written covenant not to execute in which she assigned her cause of action against Glacier to the Basshams. She made no assignment of her cause of action against Mercer and Marsh & McLennan. In return for the assignment, she received a covenant from the Basshams that they would not attempt to execute on her property in any way.

On April 13, 1983, Woods filed suit on the basis of breach of contract, estoppel, fraud, negligence, and deceptive trade practices seeking to recover the amount of the federal court judgment, as damages, trebled, and punitive damages. After a jury trial in April 1985, judgment was rendered in favor of Woods and against Mercer and

Marsh & McLennan. The jury verdict was against Mercer, Marsh & McLennan and Glacier and included findings of negligence, exemplary damages, misrepresentation, giving of false information, unconscionable acts, deceptive trade practices, and breach of fiduciary duties. The trial court granted Glacier's motion for judgment non obstante veredicto, holding that Woods take nothing from Glacier. The court found Woods's actual damages to be $1,669,645.59—apparently the amount of the federal court judgment plus interest—as a matter of law. Woods was awarded $5,008,936.77 against Mercer and Marsh & McLennan, which is three times the amount of the actual damages found by the court. The court awarded treble damages, apparently under the applicable sections of either the Deceptive Trade Practices Act or the Insurance Code.

Mercer and Marsh & McLennan complain that the trial court erred in denying Mercer's motion for judgment non obstante veredicto with respect to various jury findings, because Woods's claims for negligence, misrepresentation, and deceptive trade practices were barred by the applicable statutes of limitations. Limitations was urged as a bar to Woods's claims in a motion for summary judgment before trial and the motion for judgment non obstante veredicto. The trial court denied these motions. Woods's claims for damages under the DTPA and the Insurance Code are governed by the statutes of limitations in those Acts. They provide, respectively:

> All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. The period of limitation provided in this section may be extended for a period of 180 days if the plaintiff proves that failure timely to commence the action was caused by the defendant's knowingly engaging in conduct solely calculated to

induce the plaintiff to refrain from or postpone the commencement of the action.

Tex.Bus. & Com.Code Ann. § 17.56A (Vernon Supp.1986) (DTPA); and

All actions under this Article must be commenced within two years after the date on which the unfair method of competition or unfair or deceptive act or practice occurred or within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discovered the occurrence of the unfair method of competition or unfair or deceptive act or practice. The period of limitation provided in this section may be extended for a period of 180 days if the person bringing the action proves that the failure to timely commence the action was caused by the defendant's engaging in conduct solely calculated to induce the plaintiff to refrain from or postpone the commencement of the action.

Tex.Ins.Code Ann. art. 21.21, § 16(d) (Vernon Supp.1986). Woods's other claims for recovery fall under the general two year statute of limitations for personal injury claims in Tex.Civ.Prac. & Rem. Code § 16.-003 (Vernon 1986).

All of the acts committed by Mercer and Marsh & McLennan on which the jury verdict is based occurred on or before June 23, 1978, the date of the letter in which Mercer notified Woods that it was rejecting her application for tail coverage because payment was submitted too late. Woods knew then that her application for insurance had been rejected and that she therefore would have a gap in insurance coverage. She filed the present suit on April 13, 1983, more than two years after the acts which constituted negligence, misrepresentation or deceptive trade practices. Therefore, we conclude that Woods's causes of action are barred by the statute of limitations.

 But, Woods contends that in a cause of action for fraud or misrepresentation, the statute of limitations begins to run from the time the fraud is discovered or could have been discovered by the defrauded party through the exercise of reasonable diligence, and that whether the plaintiff has exercised reasonable diligence is a question of fact for the jury, citing *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438 (1940). She further contends that Mercer and Marsh & McLennan, having requested no special issues on the question of whether Woods discovered the fraud or could have discovered the fraud upon the exercise of reasonable diligence, are deemed to have waived their statute of limitations defense, citing Tex.R.Civ.P. 279. However, an issue which is normally a question of fact can be proven so conclusively by the evidence at trial that it becomes a question of law. *Dixon v. Southwestern Bell Telephone Co.*, 607 S.W.2d 240 (Tex.1980). It is shown conclusively by the evidence that Woods, more than two years prior to the institution of her suit, had knowledge of such facts as would cause a reasonably prudent person to make inquiry, which would lead to a discovery of the fraud. Knowledge of such facts is in law knowledge of the fraud itself. *White v. Bond*, 362 S.W.2d 295 (Tex.1962); *Wise v. Anderson*, 163 Tex. 608, 359 S.W.2d 876 (1962).

 Although Woods argues that the trial court's judgment was not based on and does not depend on the jury's findings of negligence, she contends that her negligence cause of action is not barred because she was not injured until the entry of the judgment in the Bassham suit on April 14, 1981. The general rule concerning the statute of limitations in negligence cases is that a right of action accrues in the plaintiff with the defendant's breach of a duty, although damage or an injury does not result until later; however, an action for negligence cannot be maintained unless there is some damage. Woods also contends that the failure of Mercer and Marsh & McLennan to request submission of a special issue concerning the date of Woods's injuries waived that issue. Once again, an issue which is normally a question of fact can be proven so conclusively by the evidence at trial that it becomes a

question of law. *Dixon v. Southwestern Bell Telephone Co.*, supra. It is shown conclusively by the evidence that the acts which the jury found to be a breach of Mercer's and Marsh & McLennan's duty to Woods all occurred on or before June 23, 1978, when Mercer informed Woods that she was being denied the tail coverage for which she had applied. Once Woods was denied insurance coverage, she faced a substantial risk of injury, assuming the denial of insurance was not an injury in and of itself. When Woods was sued by the Basshams and Mercer, Marsh & McLennan, and Glacier refused to provide her with a defense to the lawsuit, she suffered a concrete injury. The Bassham suit was filed before March 4, 1981, the date the settlement between the Basshams and the doctor was signed. We conclude that all of the claims raised by Woods in this suit are barred by the statute of limitations.

Mercer and Marsh & McLennan attack the trial court's finding that damages exist as a matter of law in the amount of $1,669,-645.59, as the result of the entry of a judgment against Woods in the Bassham suit. Generally, they argue that: (1) there are no damages as a matter of law; (2) there is no evidence or insufficient evidence of damages; and (3) any damages are waived due to Woods's failure to request a special issue on the amount of actual damages, a fact issue not submitted by the court.

Mercer and Marsh & McLennan ground their argument that there was no damage to Woods as a matter of law on the text of the covenant not to execute that Woods entered into with the Basshams, plaintiffs in the federal district court case, wherein they agreed that:

For and in consideration of the sum of Ten and No/100 Dollars ($10.00), and the assignment of each and every cause of action which covenantee has or may have against her professional liability insurance company, Glacier General Assurance Co., and other good and valuable consideration, the receipt of which is hereby acknowledged, covenantor agrees and covenants that neither he nor those he represents in this matter will, nor will anyone for him or on his behalf, levy or issue execution, garnishment, or any other process, including abstract of judgment against any assets or property of any kind of (sic) description, of covenantee herein, with the sole exception of any policy of insurance covering her for professional liability in connection with an injury on or about February 8, 1978, and resulting death, on or about February 24, 1978, of Ena Reed Bassham, sustained during anesthesia for childbirth.

Mercer and Marsh & McLennan argue that the covenant not to execute provides full and complete protection from the judgment for Woods and has the practical effect of discharging her liability to the Basshams. Because the Bassham judgment has been effectively discharged, they contend that Woods cannot now say that she has suffered any damage from the entry of the earlier judgment.

■ Normally, a covenant not to execute is treated as discharging a judgment so that there are no damages caused by the judgment. *Panhandle Gravel Co. v. Wilson*, 248 S.W.2d 779 (Tex.Civ.App.-Amarillo 1952, writ ref'd n.r.e.); *Restatement (Second) of Contracts* § 285(2), comment a (1981). Ordinarily, however, a covenant not to execute will not obviate the existence of damages when there is proof that an insured was forced to assign his rights against the insurer or other responsible parties to obtain that covenant.

Mercer and Marsh & McLennan also claim that Texas law does not favor awarding Woods a windfall which would enrich her far beyond any injury she may have suffered as a result of any acts of Mercer and Marsh & McLennan. They point to the testimony of Woods at trial. She testified that the agreement was signed in 1981, that since then there had never been any attempt by anyone to obtain money from her to satisfy the judgment, that neither the sheriff nor any other party attempted to sell her property, and that the Basshams had not attempted to obtain money from

her. She also testified that she understood that no one would ever attempt to get any money from her or sell her property in order to satisfy the judgment in favor of the Basshams. Woods conceded that she had not suffered any money damages as a result of the judgment. The agreement contained in the covenant not to execute was reached prior to the actual date of the execution of the covenant and, in fact, was entered into informally before judgment was rendered in federal court. During that trial, Frank Branson, then representing the Basshams, wrote the note to Woods indicating his intent to enter into an agreement not to execute on her personal assets in return for an assignment of her cause of action against her insurance carrier for bad faith, negligent refusal to settle and negligent refusal to defend. Mercer and Marsh & McLennan argue that even before the judgment was rendered, Woods was assured that she would suffer no detriment from the judgment, and thus if she is allowed to recover the amount of the judgment in this case, she will receive a windfall.

■ Mercer and Marsh & McLennan assert that there is no evidence to support the amount of actual damages or that any evidence of damages is insufficient to support the trial court's finding that the amount of actual damages was established as a matter of law. Certain rules have developed concerning damages when another's wrongful acts cause the entry of an adverse judgment against a party. In the past, in order to claim damages as a result of the entry of an adverse judgment, the claimant first had to pay the judgment and then attempt to obtain reimbursement. This became known as the "prepayment rule." *See Universal Automobile Ins. Co. v. Culberson,* 126 Tex. 282, 86 S.W.2d 727 (1935). However, the court adopted a "judgment rule" in *Hernandez v. Great American Insurance Co. of N.Y.,* 464 S.W.2d 91 (Tex.1971), and reaffirmed that rule in *Montfort v. Jeter,* 567 S.W.2d 498 (Tex.1978). Under the judgment rule of *Hernandez* and *Montfort,* when there is an existing adverse judgment offered into evidence in a suit against the tortfeasor who caused that judgment to be entered, the existing judgment is *some evidence* of actual damages, whether it is paid or unpaid. The basis of the judgment rule is that when there is a judgment against a person, his credit is affected, a lien attaches to his land, and his nonexempt property is constantly subject to sudden execution and sale. Applying the judgment rule to these facts, it can be said that there is some evidence of damage to Peggy Woods because of the existing judgment, which was offered into evidence. However, the amount of actual damage, if any, caused by the entry of the adverse judgment, is a question of fact. There appears to be no authority for the trial court's determination of actual damages as a matter of law.

■ Mercer and Marsh & McLennan say that Woods waived damages because she failed to request a special issue on this fact question. The trial court instructed a verdict on actual damages, concluding that they were established as a matter of law. In reviewing an instructed verdict, the reviewing court views all the evidence and any inferences therefrom in the light most favorable to the nonmoving party. *Collora v. Navarro,* 574 S.W.2d 65 (Tex.1978). As long as there exists more than a scintilla of evidence concerning an issue, a factual determination is required. *McDaniel v. Kudlik,* 598 S.W.2d 350 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.). In all of the cases found, the question and amount of damages appears to be a fact issue, rather than a question of law.

The trial court gave no basis for its action in determining actual damages as a matter of law, and no legal authority for this determination was cited in the briefs or has been found independently. However, Woods presents a good argument for the trial court's determination of actual damages as a matter of law. She argues that the measure of damages resulting from an insurer's refusal to defend is the amount of the judgment entered against the insured, together with any consequential damages

suffered as a result of the entry of that judgment, citing *Ridgway v. Gulf Life Ins. Co.*, 578 F.2d 1026 (5th Cir.1978); *Ranger Ins. Co. v. Rogers*, 530 S.W.2d 162 (Tex. Civ.App.-Austin 1975, writ ref'd n.r.e.). She goes on to argue that it is equally well settled that the measure of damages flowing from an insurer's negligence and deceptive acts in defending a lawsuit is, as a matter of law, the amount of the judgment, together with consequential damages, citing *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. Comm'n App.1929, holding approved), and *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.-Tyler 1984, no writ). The rule announced in *Kelly* is that in a case based upon the *Stowers* doctrine, in which an insured sues his insurer on the basis of a negligent failure to settle, the damages are, as a matter of law, the amount of the judgment which exceeds the policy limits.

Before *Stowers* was decided, there was no recovery against an insurance company in excess of the limits stated in its policy, or any recovery for a negligent failure to settle a lawsuit, it having been previously held that the insurer's only duties under an insurance policy were to defend the insured in court and pay the judgment or the judgment up to the policy limits, if the judgment exceeded the policy limits. The decision in *G.A. Stowers Furniture Co. v. American Indemnity Co.*, supra, changed the law in Texas, allowing recovery in excess of the policy limits for a negligent failure to settle a lawsuit. It was based on this stated rationale: when the liability arose against the insured, the indemnity company was duty bound to exercise ordinary care to protect the interest of the insured up to the amount of the policy because the company had contracted to act as the insured's agent and assumed full and absolute control over the litigation arising out of the accident covered by the policy. The policy provisions giving the company control of the litigation, as a matter of law, carried with it a corresponding duty and obligation on the part of the indemnity company to exercise that degree of care that a person of ordinary prudence

would under the same and similar circumstances and a failure to do so would be negligence. The basis of the *Stowers* doctrine is the contract between the insurer and the insured, and the Court, in deciding *Stowers*, said that it simply gave effect to the provisions of the policy between the parties. Woods asks that we extend the *Stowers* doctrine to a case in which there was no policy of insurance and, hence, no policy limits and no duty to defend. It is not logical to extend the *Stowers* doctrine so that it would hold a person liable for negligent failure to settle a lawsuit when that person has no duty to defend another or to pay any judgment in that lawsuit.

It is helpful to examine suits brought against insurance agents or purported agents based on their failure to procure a policy of insurance for a client. Such cases are analogous to the instant case and can provide a guide as to the measure of damages. Texas courts have held that,

> The measure of the liability for [the agent's] failure to procure insurance is the amount that would have been due under the insurance policy, provided it had been obtained.

*See Scott v. Connor*, 403 S.W.2d 453 (Tex. Civ.App.-Beaumont 1966, no writ); *Gibbs v. Allstate Insurance Company*, 386 S.W.2d 606 (Tex.Civ.App.-Fort Worth 1965, writ ref'd n.r.e.).

In other jurisdictions, it is generally held that the measure of damages for the tortious misrepresentation that insurance has been or will be provided is the loss sustained by the failure to provide that coverage. In other words, the sales agent is liable for the amount the insurer would have owed the would-be insured under the terms of the supposed insurance contract. *Gothberg v. Nemerovski*, 58 Ill.App.2d 372, 208 N.E.2d 12 (1965); *Lee v. Andrews*, 667 P.2d 919 (Mont.1983); *Stuart v. National Indemnity Co.*, 7 Ohio App.3d 63, 454 N.E.2d 158 (1982). The twin threads running through cases in these jurisdictions that deal with failure to procure insurance are that recovery is limited to the amounts which would have been provided in the

policy had one been obtained, and that the question of damages is a fact question. There seems to be no authority in other jurisdictions to support the trial court's determination of damages as a matter of law.

■■■■ Mercer and Marsh & McLennan argue that the trial court erred in refusing to submit their requested special issues on contributory negligence. Several issues were submitted to the jury inquiring about the negligence of Mercer and Marsh & McLennan. The requested special issues dealt with Woods's possible negligence in failing to immediately report the Bassham incident to Glacier and whether that failure was a proximate cause of the judgment entered against Woods, as well as the comparative negligence of Woods, Glacier, Mercer and Marsh & McLennan. If Woods had reported the Bassham incident to Glacier immediately, as she was required to do under the terms of the policy, she would have had professional liability insurance coverage for the Bassham incident, thus avoiding the damage complained of, i.e. lack of professional liability insurance coverage resulting in the entry of an adverse judgment. Woods claims that there is no evidence to support the submission of these issues. The trial court may decline to submit a relevant issue only if there is no evidence to support it. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61 (Tex.1983). There is some evidence that Woods's failure to immediately report the Bassham incident to Glacier, as required by the policy, was negligence. Therefore, the trial court should have submitted contributory negligence issues.

■■■■ Woods also contends that the issues on contributory negligence need not have been submitted because the judgment is based on a violation of the Deceptive Trade Practices Act, not the jury's finding of negligence. Woods argues that contributory negligence is not a defense to a violation of the Deceptive Trade Practices Act. Ordinarily, common-law defenses may not be used to defeat claims under the DTPA. *Roy E. Thomas Construction Co. v. Arbs*, 692 S.W.2d 926 (Tex.App.-Fort Worth), *writ*

*ref'd n.r.e. per curiam*, 700 S.W.2d 919 (Tex.1985); *Joseph v. PPG Industries, Inc.*, 674 S.W.2d 862 (Tex.App.-Austin 1984, writ ref'd. NRE). However, the trial court rendered judgment on the verdict in favor of Woods, pursuant to, among other things, the common law of the State of Texas, so it appears that negligence is at least part of the basis of the judgment.

Mercer and Marsh & McLennan maintain that the trial court erred in refusing to allow them to inform the jury during closing arguments of the trial court's prior determination that Mercer's interpretation of the policy provision concerning the purchase of tail coverage was correct as a matter of law. The following exchange occurred at trial:

MR. COOPER [attorney for Mercer and Marsh & McLennan]: One further item, Your Honor. It is our understanding that the Court has ruled that the policy, as a matter of law, requires notice and payment of the premiums within the thirty days of expiration or termination of the policy. And we would, at this time, move for an instructed verdict on this point and request that the Court's ruling earlier be formalized for the record.

THE COURT: That is my interpretation of the policy.

MR. COOPER: That's all we have at this time, thank you.

■■■■ Woods also argues that the court's ruling on the interpretation of the policy did not involve an ultimate issue in the case, and that the error, if any, in not allowing the jury to know of the court's ruling, was harmless. Error is harmless unless we are of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in the case. Tex.R.Civ.P. 434. The interpretation of the policy provision which governed the acquisition of tail coverage was a pivotal issue in this case. The trial court's determination of this issue affected most, if not all, of the other issues in the

case. The issues concerning Mercer's and Marsh & McLennan's conduct in being negligent, being grossly negligent, making misrepresentations to Woods concerning tail coverage, giving false information to Woods, committing unconscionable acts, committing deceptive trade practices by making misrepresentations to Woods and by failing to perform acts, and breaching fiduciary duties to Woods all turn at least in part on whether or not Mercer was correct when it informed Woods that the policy required payment of the premium for the tail coverage within the thirty-day period. Since the trial court ruled that Mercer's interpretation of the policy was the correct interpretation as a matter of law, it is difficult to reconcile the court's ruling with the jury findings on Mercer's and Marsh & McLennan's conduct. We do not see how Mercer could have been misrepresenting the terms of the policy when Mercer's interpretation of the policy was correct, as a matter of law.

Further, the court allowed Mercer and Marsh & McLennan to argue to the jury only the plain language of the contract, while it allowed Woods to argue not only other interpretations of the policy, but also that Mercer's interpretation of the policy amounted to a misrepresentation, although the court had already found that the other interpretations were erroneous and Mercer's interpretation was correct. The effect of this argument on the jury, especially in light of the pivotal nature of this issue, was pointed out by counsel for Mercer and Marsh & McLennan at trial:

THE COURT: [C]ertainly Mr. Cowles I will allow you to argue the plain language of the contract, which is what I have interpreted and I think we can just go from there.

MR. COWLES: Judge, I can argue plain language of the contract and the Court has already ruled on that and the jury may have some doubt about that. The Court has ruled as a matter of law and—

THE COURT: We've asked the jury no question on that issue.

MR. COWLES: Well, I understand, but the question, that issue determines the other questions as to whether or not our conduct was proper. If we were interpreting the policy correctly the Court has so ruled that and the question—

The effect on the jury of the combination of not being informed of the court's ruling on the interpretation of the policy and of Woods's jury argument was that the jury received no guidance or instruction from the court on this crucial issue and was free to follow Woods's jury arguments, although the court had already decided this issue. The court's refusal to inform the jury of its ruling, or to allow the attorneys to inform the jury of the ruling, on the correct interpretation of the policy provision was harmful error, amounting to such a denial of the rights of the appellants as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment.

Mercer and Marsh & McLennan contend that there is no evidence, or in the alternative, factually insufficient evidence, to support various jury findings. They complain of the findings that Mercer and Marsh & McLennan were negligent, grossly negligent, made misrepresentations to Woods concerning tail coverage, gave false information to Woods, committed deceptive trade practices by making misrepresentations to Woods and by failing to perform acts, committed unconscionable acts or followed an unconscionable course of action, and breached fiduciary duties to Woods and that such conduct caused the entry of the adverse judgment against Woods. In reviewing a no evidence point, we consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary or conflicting evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400 (Tex.1981). An insufficient evidence point requires us to consider and weigh all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ There was a great deal of evidence introduced by both sides. One focus of Mercer's and Marsh & McLennan's argument concerning the sufficiency of the evidence is that the trial court found, as a matter of law, that the policy provision dealing with the acquisition of tail coverage could have only one interpretation and that was the interpretation given it by Mercer and Marsh & McLennan. Most, if not all, of the jury's findings turn on the interpretation of this policy provision. It is difficult to reconcile the jury findings against Mercer and Marsh & McLennan with the trial court's holding that Mercer and Marsh & McLennan were correct in their interpretation of that provision. For instance, the jury found that Mercer and Marsh & McLennan made one or more misrepresentations to Woods concerning the tail endorsement. It seems self-evident that in order for a statement to be a misrepresentation, it must be false. Because Mercer's and Marsh & McLennan's representation of the policy's requirements concerning the premium due date for acquisition of tail coverage was correct as a matter of law, it cannot be a misrepresentation. Because the judgment in this case must be reversed on the points of error concerning the statutes of limitations and actual damages, it is not necessary to further detail the evidence and specifics concerning why the evidence is insufficient to support each questioned jury finding. Our consideration of all of the evidence in view of the requirements of *In re King's Estate,* supra, compels us to conclude that it is insufficient to support the verdict.

■ Mercer and Marsh & McLennan complain that the trial court erred in granting Glacier's motion for judgment non obstante veredicto with respect to Mercer's and Marsh & McLennan's cause of action for contribution and indemnity. Woods also complains in cross-points that the trial court erred in granting Glacier's motion for judgment n.o.v. and refusing to render judgment for Woods and against Glacier for treble damages under the Deceptive Trade Practices Act and the Insurance Code and for exemplary damages.

The grounds of Glacier's motion for judgment non obstante veredicto were that there was no evidence to support the jury's answers regarding unconscionable and deceptive trade practice acts or negligence by Glacier; that there was no finding of coverage under the Glacier policy for the Bassham claim and no finding that Glacier was negligent in failing to defend or settle the Bassham claim, both of which are required under the *Stowers* doctrine, which is the only way that an insurance company can be held liable for amounts in excess of the policy limits; and that Woods suffered no actual damages as the result of the Bassham judgment. The record appears to support these grounds.

We find other points of error raised by Mercer and Marsh & McLennan, including the failure of the trial court to grant their motion for a continuance, to be without merit.

In several cross-points of error, Woods claims that the trial court erred in failing to award her more money. She contends that the trial court should have awarded damages totalling about $12,000,000.00, including: (1) double treble damages, because she is entitled to treble damages under both the DTPA and the Insurance Code; (2) exemplary damages because the jury found that exemplary damages should be assessed against Mercer and Marsh & McLennan, and Glacier in the amount of $1,200,000.00 and $300,000.00 respectively; and (3) interest from the date of the jury verdict rather than from the date of the trial court's judgment. Because of our disposition of the issues previously discussed, we deem Woods's cross-points of error immaterial.

The judgment of the trial court is reversed and judgment here rendered that Peggy Woods take nothing by virtue of her suit.

GRANT, J., not participating.