Ramon A. GARCIA, M.D.,
Appellant/Appellee,

v.

AMERICAN PHYSICIANS INSURANCE EXCHANGE, and American Physicians Service Group, Inc., Appellants/Appellees.

No. 04–88–00150–CV.

Court of Appeals of Texas,
San Antonio.

April 10, 1991.

Rehearing Denied May 24, 1991.

Charles A. Nicholson, Pat Maloney, Sr., Law Offices of Pat Maloney, P.C., San Antonio, Ronald D. Krist, David A. Slaughter, Krist, Gunn, Weller, Neumann & Morrison, Houston, for Ramon A. Garcia, M.D.

Fred Shannon, Shannon & Weidenbach, Inc., San Antonio, Jay A. Thompson, Barry Bishop, J. Sam Winters, Clark, Thomas, Winters & Newton, Austin, for American Physicians Ins. Exch.

George H. Spencer, Clemens & Spencer, San Antonio, for third party defendants, James Williams and Kenneth Patterson.

Before REEVES, C.J., and PEEPLES and CARR, JJ.

## OPINION

CARR, Justice.

This is an appeal from a judgment rendered in favor of the insured against the insurer in a *Stowers*[1] doctrine case. Based on the jury's findings, the insured elected to have judgment entered in accordance with the Texas Insurance Code.

Dr. Ramon A. Garcia was defendant in a medical malpractice suit styled *Cardenas v. Garcia.* Following an adverse judgment in that suit, he sued his malpractice carriers, American Physicians Insurance Group (APIE), American Physicians Service Group, Inc. (APSG) and Insurance Corporation of America (ICA) for their failure to properly settle, defend and provide him coverage. He alleged that the defendants' negligence, bad faith, deceptive trade practices and Insurance Code violations caused a judgment against him in the malpractice case in excess of his policy limits.

ICA made a $2,000,000.00 payment prior to trial of the present suit and was released. Judgment was entered against APIE and APSG for $1,331,574.00. Dr. Garcia, APIE and APSG[2] have appealed.

Dr. Garcia was insured by ICA and APIE during the period he treated Cardenas, plaintiff in the malpractice suit.[3] His treatment of Cardenas began in September of 1980 and continued through January 18, 1983. Dr. Garcia was covered in 1980 by an ICA policy with a $100,000.00 limit of liability. In 1981 and 1982 he was covered by two separate ICA policies with limits of $500,000.00. His coverage by APIE began on January 8, 1983. The policy limit was $500,000.00 per occurrence. Cardenas filed the malpractice action in 1984. In March of 1984, ICA and APIE agreed to share equally the costs of defending the suit and to divide the costs of any settlement or verdict in proportion to the amounts of their coverage. Ross Crossland was hired as the lead attorney in Dr. Garcia's defense and was paid by the two carriers. Dr. Garcia's personal attorney, Clem Lyons, also assisted in his defense. James Williams and Kenneth Patterson were

---

1. *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

2. APIE is a reciprocal insurance exchange and APSG is its statutory attorney. *See* TEX.INS. CODE ANN. arts. 19.01–19.13 (Vernon 1981 and Vernon Supp.1990). "APIE" will be used in this opinion to refer to both APIE and APSG except when the context requires otherwise.

3. Actually, the plaintiff in that suit was Araminta Cardenas, the wife of Gustavo Cardenas, Dr. Garcia's patient. She sued in her individual capacity and as guardian of her husband's estate. For convenience, we will use "Cardenas" to represent both Gustavo Cardenas and Araminta Cardenas.

hired by APIE to monitor the litigation on its behalf.[4]

Trial of *Cardenas v. Garcia* began on July 29, 1985. However, on July 24, 1985, APIE notified Dr. Garcia and the various attorneys involved that it would not provide coverage because the plaintiff's pleadings then on file did not allege any acts of negligence that occurred during the APIE policy period. The letter stated that APIE was advising Lyons and ICA to continue to provide Dr. Garcia with coverage and a defense. APIE continued to pay half the costs of defending the suit until August 13, 1985.

On July 29, 1985, Cardenas filed a Sixth Amended Original Petition to allege acts of negligence occurring in 1983 during APIE's coverage. APIE was given the opportunity to re-enter the lawsuit but declined to do so. *See American Physicians Ins. Exch. v. Cardenas*, 717 S.W.2d 707, 708 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). On the same day Dr. Garcia, Cardenas and their attorneys entered into an "Assignment of Interest in Cause of Action and Agreement Designating Assets Subject to Execution," (the "Non–Execution Agreement") whereby Cardenas agreed to look only to the proceeds of the insurance policies for satisfaction of any judgment that might be entered and to indemnify Dr. Garcia for any amount of judgment rendered in excess of the amounts actually collected from ICA and APIE. In return, Dr. Garcia assigned to Cardenas and his attorneys all of his claims and causes of action against the carriers arising out of the handling of Cardenas' claims against him.

Trial of *Cardenas v. Garcia* was to the court which found that Dr. Garcia had committed acts of negligence within the period of time he was insured by APIE and ICA. Judgment was rendered against Dr. Garcia on August 30, 1985 in the amount of $2,235,483.30, plus costs of court and pre- and post-judgment interest.

The suit now on appeal was filed by Dr. Garcia against ICA, APIE and APSG on August 8, 1985. He alleged they (1) were negligent in mishandling his defense in *Cardenas v. Garcia;* (2) breached the insurance contracts by abandoning his defense and failing to investigate, negotiate and settle the suit; (3) engaged in false, misleading and deceptive acts in violation of the Deceptive Trade Practices Act; (4) engaged in unfair and deceptive acts or practices in violation of the Insurance Code; and (5) breached a fiduciary duty and the covenant of good faith and fair dealing. APIE sought indemnity and contribution from ICA.

Two agreements were entered prior to the trial of the second case. In the first, dated May 1, 1986, ICA paid $2,000,000.00 to Cardenas, Dr. Garcia and their attorneys for a full release and settlement of all claims against it arising out of the occurrences alleged in both lawsuits (the "Release"). In the second agreement, entitled "Partial Settlement Agreement" and dated May 5, 1987, APIE and APSG paid Dr. Garcia and his attorneys $500,000.00 in exchange for their agreement to a six-month continuance and for a release of any judgment against them in excess of $2.5 million.

On November 9, 1987, the case went to trial. The jury returned a verdict favorable to Dr. Garcia on each of his theories of recovery. The jury found (1) APIE was negligent in its attempts, if any, to settle Dr. Garcia's case prior to September 30, 1985, (2) APIE failed to provide coverage to Dr. Garcia after Cardenas' Sixth Amended Original Petition was filed, and (3) APIE failed to defend Dr. Garcia at the trial of the *Cardenas* case. The jury further found that each of these acts was (1) negligent, (2) a heedless and reckless disregard of Dr. Garcia's rights, (3) an unfair practice in the business of insurance, (4) an unconscionable action or course of action, (5) the proximate cause of damage to Dr. Garcia,

---

**4.** APIE filed a third party action against Williams and Patterson seeking indemnity and contribution. An instructed verdict was entered in their behalf. They have filed a brief urging that we cannot reverse the instructed verdict because of APIE's failure to bring forward a point of error challenging it. *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex.1983). The point is well taken.

and (6) done knowingly. The jury found that the failures to defend and to provide coverage were "false, misleading or deceptive acts or practices."

Regarding ICA, the jury found that its failure to settle the *Cardenas* case prior to September 30, 1985 constituted negligence, a heedless and reckless disregard of Dr. Garcia's rights, an unfair practice in the business of insurance, a failure knowingly done, an unconscionable action or course of action, and that these were proximate causes of damage to Dr. Garcia.

The jury also found that Cardenas' sixth amended petition alleged separate and distinct acts of negligence committed by Dr. Garcia during APIE's period of coverage, and that 16 percent of the damages found by the court in *Cardenas v. Garcia* were proximately caused by those acts and omissions. It also found that ICA caused 84 percent of Dr. Garcia's damages in *Garcia* v. *APIE*, while APIE caused 16 percent of those damages.

Finally, the jury found that Dr. Garcia had sustained damages of $2,235,000.00, that $250,000.00 in exemplary damages and $250,000.00 in "additional" damages should be assessed against APIE, and that Dr. Garcia should be awarded attorney's fees of $820,500.00.

Dr. Garcia elected to have judgment entered on the jury findings that APIE and APSG had violated the Insurance Code. The trial court entered judgment against APIE and APSG, jointly and severally, in the amount of $1,331,574.00 plus post-judgment interest at the rate of ten percent per annum.

Dr. Garcia's only point of error is that the trial court erroneously calculated his damages. He would calculate them as follows:

| | | |
|---|---|---|
| $2,235,000.00 | – | actual damages as found by jury |
| + 552,452.10 | – | interest on *Cardenas v. Garcia* judgment to signing of present judgment |
| − 500,000.00 | – | amount paid by APIE in Partial Settlement Agreement |
| $2,287,452.10 | – | amount to be trebled[5] |
| × 3 | | |
| $6,862,356.30 | – | damages |
| + 820,500.00 | – | attorney's fees awarded by jury |
| $7,682,856.30 | – | Dr. Garcia's damages |

APIE contends that Dr. Garcia is not entitled to any amount because (1) the underlying judgment has already been paid in full, by way of ICA's payment of $2,000,000.00 for release in both cases and APIE's payment of $500,000.00 for the partial settlement agreement in the second suit, (2) the two carriers are not jointly and severally liable and APIE has paid more than its proportionate share, and (3) to pay more than $500,000 would violate the Partial Settlement Agreement. APIE has filed a total of 11 cross-points.

### CORRECT MEASURE OF DAMAGES IN *GARCIA V. APIE*

■ APIE argues that the actual damages in *Garcia v. APIE* could only be the amount of the excess of the *Cardenas v. Garcia* judgment over the applicable policy limits. *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595, 606 (Tex.App.—Tyler 1984,

---

5. The Insurance Code no longer provides for trebling of actual damages. Instead, if the trier of fact finds that the defendant knowingly committed the acts complained of, the court is required to award, in addition to the actual damages, two times that amount. TEX.INS.CODE ANN. art. 21.21 § 16(b)(1) (Vernon Supp.1990). The amendment was effective April 4, 1985, and thus was in effect when this suit was tried. The result is the same, however, whether the actual damages are trebled or whether actual damages plus two times the actual damages are awarded.

writ ref'd n.r.e.). The amount of the *Cardenas v. Garcia* judgment was $2,235,483.30. It is undisputed that the applicable policy limits in *Cardenas v. Garcia* were $1,100,000.00 for ICA and $500,000.00 for APIE, totalling $1,600,000.00. The amount of actual damages found by the jury in *Garcia v. APIE* is $2,235,000.00, the approximate amount asked for by Dr. Garcia's attorney.

In *Kelly*, the court held:

| | | |
|---|---|---|
| $2,235,483.30 | – | Amount of final judgment in *Cardenas v. Garcia* |
| –1,600,000.00 | – | Applicable policy limits of APIE and ICA |
| $ 635,483.30 | – | Measure of damages in *Garcia v. APIE* |

In this case no actual damage issue was required to be submitted because the actual damages sustained by the Alves under each cause of action asserted herein were fixed as a matter of law in the amount of the excess judgment rendered against her in favor of Kelly over the applicable policy limits in Allstate's policy.

680 S.W.2d at 606. Applying *Kelly* to the facts of our case we find that the correct measure of damages is:

---

The actual damages sustained by Dr. Garcia in *Garcia v. APIE* were established as a matter of law in the amount of the excess judgment rendered against him in *Cardenas v. Garcia* over the applicable policy limits. *Kelly,* 680 S.W.2d at 606. The only issue in the second suit was causation, which was established against APIE.

### WHETHER THE JUDGMENT HAS BEEN PAID

One of the primary points of contention in this appeal is whether APIE's liability on the *Garcia v. APIE* judgment has been discharged. APIE points out that it and ICA have already paid Dr. Garcia $2,500,000.00 by way of the Release and the Partial Settlement Agreement. It argues that this $2,500,000.00 is more than the judgment in *Cardenas v. Garcia.*

APIE's argument is based on the assumption that a post-judgment offer of the amount of judgment in the first suit will discharge an insurer of liability under the Insurance Code.

 A belated attempt to offer policy limits will not always absolve a carrier of its prior negligence in refusing to settle. Such a policy could encourage the insurer to gamble with the insured's money in the hope of saving some of its own. When it becomes apparent that the gamble has failed and that the case will be tried, the insurer could avoid liability for the excess simply by offering its policy limits in judgment. Such is not the law. *Howard v. State Farm Mut. Auto. Liab. Ins. Co.,* 70 Wis.2d 985, 236 N.W.2d 643, 648 (1975). Nor is it the law that an insurance company may sit back and allow an excess judgment to be taken against its insured and then offer to pay the excess judgment and thereby escape liability for statutory damages under article 21.21. When the tort alleged is failure to settle, the insurance company's breach occurs at the time of the rejection of a reasonable settlement offer. *Critz v. Farmers Ins. Group,* 230 Cal.App.2d 788, 41 Cal.Rptr. 401, 406 (1964). When the allegation is failure to defend, the tort is complete at least by the time of the signing of the adverse judgment against its insured. In any case, liability under article 21.21 has attached by the the signing of the judgment in the first suit, and an offer to pay that judgment will not absolve the insurer of article 21.21 liability.

### PARTIAL SETTLEMENT AGREEMENT

 There is no question that Dr. Garcia received $500,000.00 from APIE in the Partial Settlement Agreement; the only dispute is the nature of those funds. Dr. Garcia refers to it as a payment for a continuance. This is true only in part.

The Partial Settlement Agreement plainly provides that the $500,000.00 is also to release APIE from any judgment against it in *Garcia v. APIE* in excess of $2.5 million. We quote from the agreement:

> The Partial Settlement Agreement between us will contain a release by your clients and you of any part of the judgment which may be rendered herein against APIE and/or APSG in excess of the sum of 2.5 million dollars. The $500,000.00 payment will be a credit against any such judgment, so that the only additional payment of APIE and/or APSG will be up to but not exceeding $2,000,000.00. For example, if the judgment is against APIE and/or APSG for $3,000,000.00, APIE/APSG will receive credit thereon for $500,000.00, and be released for the payment of the additional sum of $2,000,000.00. If the judgment is for $1,000,000.00, APIE/APSG will be released for the payment of $500,000.00. If APIE and APSG are successful in the case, so that no judgment is rendered against them, you and your clients will nevertheless retain the $500,000.00.
>
> \* \* \* \* \* \*
>
> The $500,000.00 consideration above referred to is paid by APIE and APSG partly in order to effectuate a continuance of this cause from its current trial setting of May 4, 1987....

The Partial Settlement Agreement clearly discharges APIE from a part of the damages Dr. Garcia now seeks on appeal to the extent that it provides a maximum liability against APIE of $2,000,000.00. However, the $500,000.00 paid by APIE is not a full discharge of its liability.

### ICA'S RELEASE

After judgment was entered in *Cardenas v. Garcia,* and before trial in *Garcia v. APIE,* ICA, in consideration of its payment of $2,000,000.00, was released by Cardenas in *Cardenas v. Garcia* and by Garcia in *Garcia v. APIE. Cardenas v. Garcia* was a malpractice suit against Dr. Garcia. ICA was not a party to that suit or subject to execution on that judgment. *Garcia v. APIE* is a suit in contract for the policy limits and in tort for *Stowers* damages. The Release is a release of liability in both contract and tort. The language states that ICA is released "from all liability for actions arising in tort or contract and for any possible causes of action of any character ... in connection with occurrence [sic] made the basis of ..." *Cardenas v. Garcia* and *Garcia v. APIE.* Therefore, the $2,000,000.00 payment was for a release in the second suit only, the only suit in which ICA was a party and subject to liability.

### JOINT AND SEVERAL LIABILITY

Dr. Garcia argues that APIE is not entitled to an 84 percent reduction in the damages found by the jury. He argues that APIE and ICA are jointly and severally liable because it is a *Stowers* suit which is based on negligence, rather than a contract action. *See Stowers*, 15 S.W.2d at 547.

APIE, on the other hand, argues that its and ICA's obligations are several based on their independent contractual responsibilities. In other words, APIE was responsible only for damages caused by acts of negligence of its insured occurring on or after the effective date of its policy; it had no such liability during the period of ICA's coverage. It cites *Traders & Gen. Ins. Co. v. Hicks Rubber Co.*, 140 Tex. 586, 169 S.W.2d 142, 147 (1943), but its reliance on that case is misplaced. *Hicks* is a contract action brought by the insured against its insurers based on their failure to pay a judgment taken against it. The issue in this appeal is the injury done to Dr. Garcia by the actions and inactions of his insurers, not the injury done to Cardenas by Dr. Garcia. In the latter case it would have been appropriate to apportion payment to Cardenas based on the amounts of coverage provided by APIE and ICA. The present case does not involve that injury. It is rather a statutory cause of action based on APIE's failure to defend, negotiate and settle, and the jury's findings that that failure constituted violations of article 21.21. The failure to defend, negotiate and settle by Dr. Garcia's insurance companies constituted an indivisible injury to him that cannot be apportioned on a pro rata basis.

APIE's liability is joint and several. Therefore, the jury's finding that APIE is responsible for only 16 percent of Dr. Garcia's damages is immaterial, and the trial court erred in reducing the damages due him.

In addition, Dr. Garcia elected to have his damages calculated under the jury findings that APIE had violated article 21.21 of the Insurance Code. There is no statutory right to contribution or indemnity from other defendants for violations of article 21.21. *Stewart Title Guar. Co. v. Sterling,* 772 S.W.2d 242, 248 (Tex.App.—Houston [14th Dist.] 1989, writ granted). Therefore, APIE is not entitled to a credit for the $2,000,000.00 payment made by ICA.

### EFFECT OF THE NON–EXECUTION AGREEMENT

APIE argues that there was no possibility of an excess judgment against Dr. Garcia because of the Non–Execution Agreement which provides that Cardenas will execute only against the proceeds of the insurance policies and not against Dr. Garcia's other assets. APIE contends that Dr. Garcia "could not be held responsible" for any excess judgment in *Cardenas v. Garcia,* and APIE is not therefore required to indemnify him.

APIE cites *Whatley v. City of Dallas,* 758 S.W.2d 301, 310 (Tex.App.—Dallas 1988, writ denied), which held that a covenant not to enforce a judgment against an insured individually will prevent recovery against an insurer in excess of policy limits. That case, however, is distinguishable. There were no findings in *Whatley,* as there are here, that the insurer acted negligently or in bad faith. *Whatley* did not decide whether an insurer is liable for damages in excess of policy limits for which the insured is not personally liable when the insurer has acted negligently or in bad faith. *Id.* at n. 6.

APIE also cites several out-of-state cases holding that a nonexecution agreement relieves the insured of an obligation to pay an excess judgment, and likewise relieves the insurer of an obligation to pay. *See,* *e.g., Freeman v. Schmidt Real Estate & Ins. Inc.,* 755 F.2d 135 (8th Cir.1985) (applying Iowa law); *Bendall v. White,* 511 F.Supp. 793 (N.D.Ala.1981); *Childress v. State Farm Mut. Auto. Ins. Co.,* 97 Ill. App.2d 112, 239 N.E.2d 492 (1968); *Stubblefield v. St. Paul Fire & Marine Ins. Co.,* 267 Or. 397, 517 P.2d 262 (1973).

These cases are decided on two theories. First, the nonexecution agreements made the insureds not legally obligated to pay damages in excess of policy limits, therefore, the "legally obligated to pay" language in the insurance policies shields the insurers from liability. Second, because the non-execution agreement protects the insureds from any liability to judgment creditors, the insureds have suffered no damage compensable by the insurers.

We do not agree either that the insured is no longer "legally obligated to pay" or that he has suffered no damage. A covenant not to execute is merely a contract and not a release. *Young Men's Christian Ass'n of Metro. Fort Worth v. Commercial Standard Ins. Co.,* 552 S.W.2d 497, 505 (Tex.Civ.App.—Fort Worth 1977), *writ ref'd n.r.e., per curiam,* 563 S.W.2d 246 (Tex.1978); *First Nat'l Indem. Co. v. Mercado,* 511 S.W.2d 354, 358 (Tex. Civ.App.—Austin 1974). Therefore, the underlying tort liability remains and a breach of contract action lies if the injured party seeks to collect the judgment in violation of the contract. The tortfeasor is still "legally obligated" to the injured party, and the insurer is still bound by its contractual promise to pay. The insured's claim against the insurer for breach of contract is not extinguished by the covenant. *Globe Indem. Co. v. Blomfield,* 115 Ariz. 5, 562 P.2d 1372, 1375 (Ariz.App.1977); *Critz,* 41 Cal.Rptr. at 410; *Whittlesea v. Farmer,* 86 Nev. 347, 469 P.2d 57, 58 (1970).

Likewise, the covenant does not "blot out" the personal judgment. *Critz,* 41 Cal.Rptr. at 410; *Bishop v. Crowther,* 101 Ill.App.3d 933, 57 Ill.Dec. 341, 344, 428 N.E.2d 1021, 1024 (1981). In this state the personal judgment could affect Dr. Garcia's credit and cloud his title to real estate.

*Hernandez v. Great Am. Ins. Co.*, 464 S.W.2d 91, 94 (Tex.1971). The judgment in *Cardenas v. Garcia* established the damages in this case. *Kelly*, 680 S.W.2d at 606. The covenant not to execute did not eliminate those damages. So it cannot reasonably be asserted that a covenant which does not release the judgment but merely limits execution to specific assets negates all damages the judgment debtor may suffer. We hold that the Non–Execution Agreement does not affect APIE's liability to Dr. Garcia.

APIE also argues that the Non–Execution Agreement violated the provision of the insurance policy prohibiting assignability by the insured. It argues that by assigning his interest in the policy to Cardenas, Dr. Garcia violated the policy's "no action" clause which reads as follows:

No action shall lie against the Exchange unless, as a condition precedent thereto there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the Exchange.

The Non–Execution Agreement was entered after APIE had already breached the policy by refusing to provide the doctor with coverage. An insurance company may not insist on compliance with the no action clause after it has been given the opportunity to defend the suit or to agree to a settlement and refuses to do either. *Gulf Ins. Co. v. Parker Products, Inc.*, 498 S.W.2d 676, 679 (Tex.1973). We hold that the same reasoning applies to the policy's assignability prohibition.

APIE also maintains that the assignment violates public policy. It complains that when "the assignment is made prior to the alleged wrongful acts of the insurer, there still existed an obligation on the part of the insurer to defend its insured[,]" and that "[t]his obligation is a personalized relationship based on confidence and trust...." We wonder what became of this "personalized obligation based on confidence and trust" when APIE was refusing to defend its insured in the face of a pleading clearly alleging acts by the insured during the period of coverage. Obviously the assignment was not made prior to the insurer's wrongful acts. Although the Non–Execution Agreement was entered on the same day the sixth amended petition was filed, there is nothing in the record to indicate which came first, the petition or the Non–Execution Agreement. It is clear, however, that APIE was given an opportunity to re-enter the suit, which it refused. Once an insured has been left alone to defend himself it is reasonable that he covenant against his own liability and hold the costs of his defense to a minimum if he can. *Young Men's Christian Ass'n of Metro. Fort Worth*, 552 S.W.2d at 504; *First Nat'l Indem. Co. v. Mercado*, 511 S.W.2d at 358. Such agreements have been upheld by the courts, and we hold that they are not violative of public policy so long as no collusion has been shown.

## FAILURE TO SETTLE

APIE argues that the trial court erred in entering judgment against it based on its failure to settle. APIE insists that there can be no violation of the duty to settle without evidence that the injured party would have settled within the insured's policy limits. It further complains that it was never given the opportunity to settle separately from ICA prior to the trial of *Cardenas v. Garcia*. It offers no authority to support these arguments other than its allegation that an element of a *Stowers* cause of action is that an injured party would settle within the policy limits of the insurer.

There is ample evidence that Cardenas attempted to settle with Dr. Garcia's counsel even prior to the time APIE withdrew. Further, the settlement offers were within the policy limits. On July 15, 1985, Cardenas' attorney wrote to Mr. Crossland, the attorney provided by APIE and ICA, offering to settle for $600,000.00, the amount represented to him to constitute the avail-

able insurance coverage.[6] This letter was soon followed by a letter from Mr. Lyons, Dr. Garcia's personal counsel, imploring Crossland to accept the offer. The offer was not replied to, and on the 24th APIE denied coverage and withdrew from the suit.

Then, after plaintiff's sixth amended petition was filed alleging negligence on the part of Dr. Garcia within the term of APIE's coverage, Cardenas again offered to settle for what he believed to be the limits of coverage, and again Lyons urged Crossland to settle. Again, the result was the same; no settlement was reached. APIE, either alone or in conjunction with ICA, made no attempt to settle or to negotiate with Cardenas.

Even if no such offers had been made, it is not the law that an insurer's only duty is to respond to an unconditional offer to settle all claims against the insured within the limits of the policy. The insurer has the duty to investigate, prepare for the defense of the lawsuit, try the case and make reasonable attempts to settle. *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656, 659 (Tex.1987). The duty of an insurer to settle also implies the duty to negotiate. *Chancey v. New Amsterdam Cas. Co.,* 336 S.W.2d 763, 765 (Tex.Civ. App.—Amarillo 1960, writ ref'd n.r.e.). If an insurer refuses an offer of settlement when it appears that an ordinary prudent person in the insured's situation would have settled, the insurer may be held liable for damages. *Guin,* 723 S.W.2d at 659; *Stowers,* 15 S.W.2d at 547.

APIE argues that it had no duty to settle prior to the sixth amended petition because plaintiffs had before then failed to allege negligence on the part of Dr. Garcia within the period of APIE's coverage. Following the filing of the sixth amended petition, APIE claims it had no duty to settle because of the Non–Execution Agreement executed on the same day. APIE argues that with that agreement Dr. Garcia was no longer exposed to the possibility of an ex-

cess judgment and that it therefore no longer had the duty to settle within policy limits.

We have already held that the Non–Execution Agreement did not affect APIE's liability to Dr. Garcia. Nor did it affect the duty to settle. Nor are we prepared to hold that APIE had no duty to make any attempt to settle for the year and four months it provided coverage to Dr. Garcia prior to its withdrawal on the eve of trial. As the supreme court said in *Guin,* the insurer's duty to its insured extends to the full range of the agency relationship, including investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle. 723 S.W.2d at 659. A belated attempt to offer policy limits will not always absolve a carrier of prior negligence in refusing to settle. Such a policy could encourage the insurer

> to gamble with the insured's money in the hope of saving some of its own. When it becomes apparent that the gamble has failed and that the case will be tried, the insurer could avoid liability for the excess simply by offering its policy limits in judgment. Such is not the law.

*Howard,* 236 N.W.2d at 648. *See also Critz,* 41 Cal.Rptr. at 406.

### DTPA AND INSURANCE CODE VIOLATIONS

APIE argues that it did not engage in a deceptive or unfair act or practice in the defense or settlement of *Cardenas v. Garcia* or with respect to its coverage under its policy. It also contends that there is no evidence or insufficient evidence to support jury findings with regard to its failures to settle, to defend or to provide coverage.

In considering a no evidence point, we consider only the evidence favorable to the decision of the trier of fact. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex. 1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). An insufficient evidence point requires that we assess all the evidence and reverse for a new trial only if

---

**6.** Cardenas' attorney had been told that the limits on the ICA policy were $100,000.00 and the limits on the APIE policy were $500,000.00.

the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp.1990) makes actionable any violation of TEX.BUS. & COM.CODE ANN. § 17.46 (Vernon 1987) including any practice whether listed under 17.46(a) or not, that is determined to be false, misleading or deceptive. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 135 (Tex.1988). The jury found that APIE failed to defend and to provide coverage and that these failures were false, misleading or deceptive acts and practices. The evidence showed that APIE failed to negotiate or to attempt to reach a settlement with Cardenas during the time it provided coverage to Dr. Garcia. It also showed that following the filing of the sixth amended petition, APIE was given the opportunity to re-enter the case and provide coverage and a defense to Dr. Garcia, but it refused to do so. The jury's answers to the DTPA and Insurance Code questions are supported by sufficient evidence. Further, under the reasoning in *Vail*, these findings constitute a determination that APIE violated section 17.46(a) of the DTPA. *Vail*, 754 S.W.2d at 135. A violation of section 17.46 is a violation of article 21.21 section 16(a) of the Insurance Code. *Chitsey v. National Lloyds Ins. Co.*, 738 S.W.2d 641, 642 (Tex.1987).

## EXCLUSION OF EVIDENCE

 APIE asserts the trial court erred in excluding two categories of evidence. First, it argues that the trial court erroneously excluded the Release and Partial Settlement Agreement. It argues that their exclusion deprived it of its defense of payment of the underlying judgment.

Under *Kelly*, the amount of damages is not a jury question; it is established by the judgment in the underlying cause. The amount of damages in *Garcia v. APIE* should not even have been submitted to the jury. It was therefore immaterial whether the jury was aware that the $2,000,000.00 had been paid to Cardenas, Dr. Garcia and their attorneys.

Second, APIE argues that the court erred in excluding evidence (1) of its efforts in the *Cardenas v. Garcia* appeal on behalf of Dr. Garcia and (2) that Dr. Garcia voluntarily dismissed that appeal. APIE complains that Dr. Garcia breached his duty to cooperate.

 We have previously held that by its rejection of its right to participate in the trial following the filing of Cardenas' sixth amended petition, APIE waived the right to challenge the judgment by appeal or writ of error. *American Physicians Ins. Exch. v. Cardenas*, 717 S.W.2d at 709. We also held that APIE had a duty to re-enter the case upon the filing of the sixth amended petition. *Id.* Having breached its duty to defend Dr. Garcia, it cannot insist on its insured's performance of policy provisions that require appeal from the judgment rendered. *American Fidelity & Cas. Co. v. Williams*, 34 S.W.2d 396, 404 (Tex.Civ. App.—Amarillo 1930, writ ref'd). There was no error in the exclusion of this evidence.

## APSG

APIE argues that the court erred in rendering judgment against APSG given the absence in the record of a basis for such recovery. APIE is a reciprocal insurance exchange organized under Chapter 19 of the Insurance Code. The affairs of a reciprocal exchange, on behalf of its subscribers, are required to be performed and maintained by a duly appointed attorney-in-fact. TEX.INS.CODE ANN. art. 19.02 (Vernon 1981). APS Facilities Management, Inc. is the attorney-in-fact of APIE. APIE is managed by APS Facilities Management which is a wholly owned subsidiary of APSG. APIE complains that no issues were submitted concerning APSG.

Dr. Garcia pleaded that the policy he purchased was issued by APIE and APSG, that APIE acted as APSG's agent, and that both injured him by their actions or inaction. It was undisputed that APSG is the

management arm of APIE. It was also undisputed that the adjustors and employees who handled the claim against Dr. Garcia were employees of APSG and were operating within the course and scope of their employment with the service group. The policy shows it was issued by "American Physicians Service Corporation" as attorney-in-fact for APIE.

 The matter of APIE's authority to act as APSG's agent and thereby bind APSG by its actions was a component element of Dr. Garcia's theory of recovery. *Rodriguez v. Higginbotham–Bailey–Logan Co.*, 172 S.W.2d 991, 993 (Tex.Civ. App.—San Antonio 1943, writ ref'd). By failing to request a jury question regarding APIE's agency it waived a jury determination of that element, and the trial court was free to find that APIE either was or was not APSG's agent. *Id.;* TEX.R.CIV.P. 279. Based upon the court's entry of a joint and several judgment against APIE and APSG, however, the court impliedly found that the agency relationship existed. *Yorfino v. Ferguson*, 552 S.W.2d 563, 564 (Tex.Civ. App.—El Paso 1977, no writ); TEX. R.CIV.P. 279. The deemed finding is supported by the evidence.

## PUNITIVE DAMAGES

APIE asserts that the award of punitive damages against it is violative of the excessive fines provisions of the United States and Texas Constitutions, U.S. CONST. amend. VIII, TEX. CONST. art. I, § 13, and the due process clause of the United States Constitution. U.S. CONST. amend. V and XIV. Specifically, it challenges the award of multiple damages provided by article 21.21 of the Insurance Code.

 APIE made no objection to the question which asked the jury to determine the amount of Dr. Garcia's damages. It also failed to raise its constitutional objection to the part of the jury charge that inquired whether APIE knowingly committed the acts complained of. An affirmative finding on the "knowingly" issue requires the trial court to award, in addition to the actual damages found, two times that amount. TEX.INS.CODE ANN. art. 21.21 § 16(b)(1) (Vernon Supp.1991). APIE has therefore waived any complaint that doubling the damages is unconstitutional. TEX.R.CIV.P. 272, 274.

## CALCULATION OF DAMAGES

Dr. Garcia's damages are properly calculated as follows:

| | |
|---|---|
| $ 635,483.30 | – Measure of damages as a matter of law: Amount of excess judgment over applicable policy limits. *Kelly*, 680 S.W.2d at 606. |
| + 146,774.73 | – 10% interest on *Cardenas v. Garcia* excess judgment from August 30, 1985 to signing of present judgment on December 21, 1987. |
| $ 782,258.03 | – Total actual damages. |
| +1,564,516.06 | – Double actual damages. Ins.Code 21.21. |
| $2,346,774.09 | |
| + 820,500.00 | – Attorney's fees awarded. |
| $3,167,274.09 | |

Because these damages of $3,167,274.09 are in excess of $2,500,000.00, APIE's payment of $500,000 in the Partial Settlement Agreement applies as a credit against the judgment so that an additional payment by APIE in the amount of $2,000,000.00 releases it from the part of the judgment in excess of that amount. The judgment of the trial court is modified that Dr. Garcia recover from APIE and APSG damages in the amount of $2,000,000.00. As modified, the judgment is affirmed.

PEEPLES, Justice, dissenting.

In this *Stowers* [1] case the majority has forgotten that actual damages are to com-

pensate, and that a *Stowers* suit lies to redress harm to the insured alone. I dissent from the majority's holdings that (1) the covenant not to execute did not extinguish the *Stowers* cause of action, (2) APIE was not entitled to either a percentage reduction or a dollar offset for a co-defendant's settlement, and (3) the covenant not to execute and the co-defendant's payment of $2.0 million were properly excluded from evidence and kept hidden from the jury.

The insured, plaintiff Garcia, has no damages to recover because Cardenas, the original plaintiff, gave him a covenant not to execute on his assets. A *Stowers* case lies to repair harm to the insured alone—not the original plaintiff—and the covenant not to execute removes the threat that the underlying judgment posed to Garcia.

Apart from the covenant not to execute—which eliminates the insured's damages—the real plaintiffs have been compensated for most of the original judgment, which should reduce their recovery. In the underlying malpractice case the plaintiffs were awarded $2.235 million in damages. After they filed their *Stowers* case but before it was tried a co-defendant (ICA) paid them $2.0 million. The trial court in the *Stowers* case awarded them another $1.331 million. The majority now holds that the trial court's figure was wrong, and that the plaintiffs are entitled to an additional $2.0 million instead of $1.331 million. If the plaintiffs had not agreed to a liability cap, says the majority, they would be entitled to $3.167 million above and beyond the $2.0 million that they have already received—a total recovery of $5.167 million even though the trier of fact in the underlying malpractice case found that their damages were $2.235 million. Plaintiffs ask this court to render judgment for additional damages amounting to $7,682,856.30.

As if all this were not enough, the majority affirms the trial court's refusal to let APIE tell the jury about either the $2.0 million payment or the covenant not to execute. Both kinds of evidence bore directly upon the issue of how much damage Garcia had really sustained. But the trial court kept the jury from knowing about this evidence. Thus blindfolded, the jury awarded $2.235 million in damages, the exact amount of the underlying judgment, most ($2.0 million) of which had been paid in cash and which does not damage Garcia or threaten his assets.

## I. FACTS

*The malpractice case.* The details of this case are found in the majority opinion, and I highlight only the salient facts that pertain to the issues herein. Cardenas brought a malpractice suit against Dr. Garcia in 1984. Because Garcia's treatment of Cardenas spanned more than one policy period, Garcia had insurance coverage with two carriers—ICA and APIE—which had a combined liability coverage of $1.6 million. The two carriers hired attorney Ross Crossland to defend Garcia. Shortly before trial—on July 24, 1985—APIE announced that Cardenas' live pleading did not allege negligence during a period that APIE had coverage, and that it would therefore no longer defend him. Crossland continued to represent Garcia.[2] Cardenas promptly amended and alleged negligence during APIE's coverage, but APIE nevertheless did not reenter the defense.[3]

---

1. *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

2. The majority is wrong to suggest that the insured, Garcia, was left undefended and unrepresented at trial. He was represented throughout by Ross Crossland, who was hired initially by ICA and APIE. When APIE withdrew coverage, Crossland kept representing Garcia, to whom he owed his undivided loyalty. *See Employers Cas. Co. v. Tilley,* 496 S.W.2d 552, 558–59 (Tex.1973).

3. In the malpractice case Plaintiff's Fifth Amended Original Petition alleged that Dr. Garcia treated Mr. Cardenas from "about October 3, 1980 up until about April 12, 1982." When APIE withdrew its defense on the ground that the petition did not allege an act of negligence during its coverage period (which began on January 8, 1983), plaintiffs filed their Sixth Amended Original Petition, which alleged that Dr. Garcia treated Mr. Cardenas from "about September 19, 1980 up until about February or March, 1983."

On July 29, 1985 two significant events occurred: (1) Garcia assigned all his rights against both of his insurance companies (ICA and APIE) to Cardenas, and Cardenas covenanted not to execute against any of Garcia's assets, with the exception of his insurance policies,[4] and (2) the parties waived a jury and proceeded to trial of the malpractice case. The case was not settled within the combined insurance coverage of $1.6 million, and the trial resulted in a judgment (signed on August 30, 1985) against Garcia for $2.235 million.

*The Stowers case.* On August 8, 1985, Garcia brought a *Stowers* suit against APIE and ICA that included claims under the DTPA and article 21.21 of the insurance code. In June 1986 ICA settled with Cardenas for $2.0 million. In April–May 1987 APIE paid Cardenas $500,000 in return for a six-month continuance, an agreement that the plaintiffs would oppose a separate trial or severance sought by any of the defense attorneys who had been sued, and a liability cap of $2.0 million in the *Stowers* case. The jury answered the liability issues in favor of Garcia and assessed damages at $2.235 million. The jury found that 16% of Garcia's damages occurred during APIE's coverage and 84% during ICA's coverage. The court rendered judgment for $1.331 million. Garcia seeks to have that amount increased to $7.682 million, and APIE seeks to have it eliminated or reduced.

Thus, in the malpractice case Garcia suffered a judgment for $2.235 million, which was $.635 million in excess of his coverage. Cardenas has been paid $2.0 million. The holder of the judgment, Cardenas, has agreed never to execute against any of his assets. Yet the majority holds that Cardenas (by assignment, asserting Garcia's rights) is entitled to an additional $2.0 million.

## II. THE EFFECT OF THE COVENANT NOT TO EXECUTE

Did the covenant not to execute eliminate damages to the insured under *Stowers?* I think that it did. The majority does not come to grips with a fundamental principle of *Stowers* litigation: *the cause of action lies not to fund the malpractice judgment but to repair the harm that the excess judgment causes the insured.* Of course a *Stowers* recovery does end up satisfying the underlying judgment because the insured pays the money to the original plaintiff. But the reason for the *Stowers* action is to eliminate the harm that the insured

---

**4.** The instrument is entitled, "Assignment of Interest in Cause of Action and Agreement Designating Assets Subject to Execution." Its pertinent provisions are as follows:

> ARAMINTA CARDENAS, Individually and as Guardian of the ESTATE OF GUSTAVO CARDENAS [Cardenas] and LAW OFFICES OF PAT MALONEY, P.C. hereby agree and covenant that should judgment against DR. RAYMOND A. GARCIA [Garcia] be obtained in the above-referenced cause [the malpractice case], they shall not levy or issue execution, garnishment or any other process, including abstract of judgment against any assets, or property, of any kind or description, of [Garcia] with the sole exception of the liability insurance policy or policies which the Defendant, [Garcia], as insured thereunder may have with ICA and/or API.
>
> ....
>
> It is further agreed that [Cardenas] will indemnify [Garcia] to the extent of any amount of judgment which might be rendered in favor of [Cardenas] against [Garcia] in excess of what is actually collected from the insurance carrier.
>
> ....

> For and in consideration of the foregoing promise to look only to the proceeds of the liability insurance policies described above in satisfaction of any judgment these Plaintiffs may be entitled to against [Garcia, Garcia] sells, assigns, transfers, sets over and delivers to [Cardenas] and LAW OFFICES OF PAT MALONEY, P.C., their executors, administrators, and assigns, for their use and benefit, any and all sum or sums of money now due or owing [Garcia] and all claims, demands, and cause or causes of action of whatsoever kind and nature, which Defendant, [Garcia], has had or now has, or may have against Defense Attorneys or ICA or API, or any other person or persons, and each and any of them, whether jointly or severally, arising out of, or for any loss, injury or damage sustained by him, or cause or causes of action arising, growing out of, or relating to, or connected with the handling of the claims of [Cardenas] against [Garcia].

The instrument, dated July 29, 1985, is signed by Mrs. Cardenas, Dr. Garcia, Clem Lyons [his individual attorney], Thomas D. Jones [for Law Offices of Pat Maloney, P.C.], and James A. Kosub [attorney ad litem].

suffers because of his insurer's failure to settle the case. In this case the covenant not to execute has removed $2.235 million worth of harm to Garcia. The agreement protects Garcia and his assets from the malpractice judgment.

Under these circumstances I would hold that Garcia cannot recover the excess of the malpractice judgment over his insurance coverage. The plaintiff in the original case cannot collect the excess judgment directly from the insured's insurer. *Whatley v. City of Dallas,* 758 S.W.2d 301, 307, 310 (Tex.App.—Dallas 1988, writ denied); *Becker v. Allstate Ins. Co.,* 678 S.W.2d 561, 561 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd, n.r.e.); *Samford v. Allstate Ins. Co.,* 529 S.W.2d 84, 85–87 (Tex. Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); *Cook v. Superior Ins. Co.,* 476 S.W.2d 363, 364–65 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.). In other words, Cardenas had no right to collect the excess part of the malpractice judgment directly from APIE or ICA. She could collect the judgment up to the policy limits of $1.6 million from the insurers. But she had no right to sue APIE or ICA for the excess. Otherwise she would have sued APIE directly and would not have bothered to get an assignment from Garcia. If Garcia had refused to assign her his *Stowers* rights from his insurance companies, she would have been limited to collecting the judgment excess ($.635 million) against his nonexempt assets.

The only person who can bring suit against the insurance company and collect on the excess judgment is Garcia, because the *Stowers* suit lies to redress the harm that the judgment causes him. It does not lie to fund the underlying judgment. A *Stowers* suit is a suit by the insured for

damages caused him by an excess judgment. In *Stowers* the insured (Stowers Furniture Company) had a $5000 liability policy. A tort suit against it could have been settled for $4000, but the carrier would not settle the case for that amount. The jury returned a verdict for $14,000. In effect the insured (Stowers) said, "My insurance company could have settled the case against me within my policy limits, but it was negligent and did not settle. I am injured by the $14,000 judgment against me, which I have paid. My insurance company should compensate me for the excess judgment I have suffered." The commission of appeals held that the insured had a negligence cause of action against its insurance company for the damages caused by the excess judgment. 15 S.W.2d at 546–48.[5]

Six years later the supreme court in *Universal Automobile Ins. Co. v. Culberson,* 126 Tex. 282, 86 S.W.2d 727, 730 (1935), adopted the "prepayment" rule and said the insured had to pay the judgment before it could collect from its insurance company. In effect the court said that the insured does not suffer injury until it has paid all or part of the judgment.

In *Hernandez v. Great Am. Ins. Co.,* 464 S.W.2d 91 (Tex.1971), the supreme court overruled *Culberson,* rejected the prepayment rule, and held that the mere existence of the excess judgment is enough to trigger the right to bring a *Stowers* suit. But the court did not eliminate the principle that the *Stowers* suit exists because the insured suffers damages. Hernandez (the insured), said the court, suffered an excess judgment in the amount of $56,636 because of the negligence of Great American.[6] *Id.* at 94. The court continued:

**5.** Two recent cases have made the following statement in dictum (emphasis added): "In *Stowers* [citation omitted] the court allowed a *third-party claimant* to sue the *tortfeasor's insurance company* for the portion of a judgment in excess of the policy limits when the insurance company unreasonably failed to settle a claim within the tortfeasor's policy limits." *See Bowman v. Charter General Agency, Inc.,* 799 S.W.2d 377, 380–81 n. 1 (Tex.App.—Corpus Christi 1990, no writ); *Caserotti v. State Farm Ins. Co.,* 791

S.W.2d 561, 566 n. 2 (Tex.App.—Dallas 1990, writ denied).

The briefest reading of *Stowers* shows that this statement is utterly wrong. In the *Stowers* litigation the original plaintiff, named Bichon, sued the original defendant, the G.A. Stowers Furniture Company. Stowers, the insured tortfeasor, paid the excess judgment and sued its liability carrier, American Indemnity Company.

**6.** The underlying judgment for $81,636 had been affirmed on appeal. *See Hernandez v.*

The judgment injures Hernandez while it remains unpaid. His credit is affected. A lien attaches to his land. His non-exempt property is constantly subject to sudden execution and forced sale. He is entitled to relief from the harm if it is the fault of the tortfeasor.

*Id.* at 94. The supreme court quoted this passage with approval in *Montfort v. Jeter,* 567 S.W.2d 498, 500 (Tex.1978), and *Street v. Second Court of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

In *Hernandez* the supreme court said that "the Stowers action *lies to repair the harm to the insured.* The tort of the insurer in mismanaging the defense of the insured in the first case is *harmful to the insured alone.*" 464 S.W.2d at 94 (emphasis added). "We hold that Hernandez is entitled to sue for relief as to the unpaid portion of the former judgment as well as for the $10,500 which has been paid [by Hernandez]." *Id.* at 95.

The supreme court's recent opinion in *Street v. Second Court of Appeals,* 756 S.W.2d 299 (Tex.1988), reaffirms *Hernandez* and the principle that the essence of a *Stowers* suit is the *harm to the insured and the threat to his assets and credit.* *Street* held that the insured can bring a *Stowers* action on the excess judgment as soon as it becomes final and the trial court loses jurisdiction over it, unless the insurer supersedes it. The fact that the insurance company is appealing the judgment does not stall the *Stowers* suit. The court reasoned that the unsuperseded judgment poses a *threat of collection* even though it is being appealed:

A judgment which is not superseded *can, of course, be executed upon* regardless of its appellate status. TEX.R.APP.P. 40(a)(5). *Thus, the insured remains at risk.* The injustice is readily apparent if the insurer can leave the insured *exposed to collection of the judgment* during the pendency of an appeal.…

*Baucum,* 344 S.W.2d 498 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). The policy limits were $25,000. The insurer paid the policy limits, leaving Hernandez liable for an excess judgment of $56,636. The judgment had been fur-

756 S.W.2d at 301 (emphasis added). The court then discussed the economic impact of a judgment and quoted the passage from *Hernandez* that is quoted above.

These cases establish some bedrock principles: (1) the gist of the *Stowers* case is the *damage to the insured* caused by the judgment; (2) that damage occurs, regardless of whether the insured has paid the judgment, *because his property is encumbered and is constantly subject to execution, lien, etc. and his credit is affected;* and (3) the original plaintiff has no legal interest in the *Stowers* suit because the cause of action lies to repair damage to the insured, not to fund the judgment for the original plaintiff. In other words the essence of a *Stowers* suit is the harm to the insured's property and credit caused by the threat that the excess judgment will be collected from the insured individually.

If the threat to the insured's property is removed by a covenant not to execute, there is nothing left of the *Stowers* suit to recover the amount of the judgment. That is what the court held in *Whatley:*

To recover more than the policy limits from the insurer, *the judgment creditor must assert the insured's injury. If the judgment cannot be enforced against the insured, no such injury exists.* The insured may assign to his judgment creditor any claim he has against his insurer for payment of the excess award, but *such assigned claim is actionable only as long as the insured remains liable for the excess damages.*

758 S.W.2d at 310 (emphasis added). The Fifth Circuit said the same thing in *Foremost County Mut. Ins. Co. v. Home Indem. Co.,* 897 F.2d 754, 757 (5th Cir.1990): "[T]here must be not only negligent refusal to settle by the insurer but also subsequent harm to the insured." The Fifth Circuit agreed with the *Whatley* court's statement, "If the judgment cannot be enforced against the insured, no such injury exists," and held that there must be injury to the

ther reduced by $10,500 when the original plaintiff levied execution on a parcel of Hernandez's land. *See Hernandez v. Great Am. Ins. Co.,* 464 S.W.2d at 92.

insured even when the insurer is guilty of bad faith or negligence. *Id.* at 758 n. 4. A student commentator summarized the law in the same way:

> [I]t should be noted that the Texas Supreme Court did not dispose of the need for injury in a *Stowers* suit when it abolished the prepayment rule [in *Hernandez*]. The court merely enlarged the scope of the injury to include the adverse effects an unpaid judgment has upon a judgment debtor. Consequently, *an agreement that relieves the insured of his liability from the previous judgment would probably destroy the* Stowers *cause of action since the essential injury to the insured would no longer exist under the terms of the release.*

Comment, *An Insurer's Failure to Settle: Standing Under the Stowers Doctrine, Texas Deceptive Trade Practices Act, and Article 21.21 of the Insurance Code,* 34 BAYLOR L.REV. 441, 441 n. 2 (1982) (emphasis added).

*Whatley* was a failure-to-defend case, and in footnote six, the court said that it expressed no opinion on the application of the harm principle in a case of negligence or bad faith. 758 S.W.2d at 310. I am not sure exactly what that statement means because *Street* and *Hernandez* were *Stowers* negligence cases, not failure-to-defend cases, and the quoted passage from *Whatley* cites *Hernandez* and rests firmly on it. The cause of action for an excess judgment belongs to the insured in both failure-to-defend cases and failure-to-settle cases, and in each kind of case the cause of action lies only to repair harm or damage to the insured. *Whatley* certainly did not hold that in *Stowers* cases the excess judgment

can be collected from the insurer even though the judgment has in effect been released and no longer threatens the insured's assets and credit.

In the present case the insured, Dr. Garcia, has obtained an agreement from the original plaintiff, Cardenas, that she will not seek to satisfy the underlying judgment against his assets and that she will look only to his insurance policies for satisfaction. Under these circumstances there is absolutely no harm to the insured, Dr. Garcia, in the sense of possibility of collection.[7] There may be harm in the sense of liens and possible damage to credit, but clearly it cannot be said that Dr. Garcia's "non-exempt property is constantly subject to sudden execution and forced sale." *Hernandez,* 464 S.W.2d at 94. And, to use *Street*'s terminology, it cannot be said that the judgment can "be executed upon," or that it "leave[s] the insured exposed to collection." *Street,* 756 S.W.2d at 301. Since Cardenas no longer has any quarrel with Garcia, I am not sure who would want to record the judgment, and if anyone did record it, Garcia could certainly get a declaratory judgment that his assets are free of it. But in any event the *Stowers* judgment before us is not based on lien and injury-to-credit damages. It is based on the amount of the malpractice judgment,[8] which because of the assignment and covenant not to execute does not threaten Garcia or his property any longer.

The majority relies exclusively on *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.), which said that as a matter of law the insured's damages equal the excess amount

---

7. The majority makes the curious argument that because the covenant not to execute does not blot out the underlying malpractice judgment, that judgment still damages Garcia. I agree that in theory there is a possibility that Cardenas would breach the agreement and try to collect individually from Garcia by levying on his assets. But this case was not tried on that theory, and it is hard to imagine any attorney arguing to a jury in the *Stowers* case that his present client (Garcia) is damaged by the possibility that his former client (Cardenas) might breach the covenant not to execute and pursue his present client's assets.

8. Plaintiff's counsel made this clear in jury argument (emphasis added):

> You see the first trial was for determination of the verdict on the judgment. *This trial is for funding of the judgment.... This actual damage issue should be the same amount as the judgment,* that is roughly two and a quarter million with a prejudgment interest that Judge Chapa found. You see this is issue— because you see *that this is the actual damages that is inflicted against Dr. Garcia,* and a Dr. Garcia assigned those rights over to Mr. Cardenas. So that is the appropriate answer. Two point two three five million.

of the underlying judgment. Citing *Kelly*, the majority says that because damages were established as a matter of law, "the only issue in the second suit was causation." But *Kelly* did not raise or answer the questions discussed here. The original plaintiff in *Kelly* had not entered a covenant not to execute,[9] as Cardenas did in this case. Therefore *Kelly* cannot stand for the notion that damages are fixed as a matter of law in the amount of the underlying judgment when the insured has protected his assets by negotiating a covenant not to execute.

Garcia cites several cases that hold that a covenant not to execute does not extinguish the underlying judgment. *See, e.g. Young Men's Christian Ass'n v. Commercial Standard Ins. Co.*, 552 S.W.2d 497 (Tex.Civ.App.—Fort Worth 1977), *writ ref'd n.r.e. per curiam*, 563 S.W.2d 246 (Tex.1978); *First Nat'l Indem. Co. v. Mercado*, 511 S.W.2d 354 (Tex.Civ.App.—Austin 1974, no writ). But *Y.M.C.A.* and *Mercado* were not *Stowers* cases and they did not involve judgments in excess of policy limits; they held that when the insured enters into a covenant not to execute he does not thereby violate the terms of the insurance policy. In other words, by entering the covenant not to execute the plaintiff does not give up the right to collect the judgment from the insurance company up to the policy limits. As I have stated, the covenant not to execute does not affect Cardenas's right to collect the judgment up to the $1.6 million policy limits, directly from the insurers, even though she signed the covenant not to execute.

For these reasons I would hold that the covenant not to execute removed the harm to Garcia and therefore an essential element of the *Stowers* cause of action—damage to the insured—is missing. The trial court should have granted APIE's motion for judgment, which asserted this ground.

## III. PERCENTAGE REDUCTION OF LIABILITY

This case also raises the question of what kind of offset or contribution a defendant gets when a co-defendant has settled and the plaintiff recovers under § 21.21 of the Insurance Code. The majority holds that the non-settling defendant (APIE) gets neither dollar offset nor percentage reduction. I disagree with that holding.

The malpractice judgment rested on findings that Dr. Garcia had committed negligence over a period of time when he had coverage with two successive insurance carriers—ICA and APIE. Dr. Garcia had treated Mr. Cardenas from late 1980 until early 1983. ICA provided Dr. Garcia's liability insurance coverage from the beginning through January 7, 1983. APIE had coverage for one year, beginning January 8, 1983.

In the *Stowers* trial the jury found that 84% of the Cardenas injuries occurred during ICA's coverage and 16% during APIE's coverage. In two separate answers the jury found (1) that Dr. Garcia caused 16% of Cardenas' damages after January 8, 1983 (the beginning of APIE's coverage),

**9.** In *Kelly* after the excess judgment had been rendered, the original plaintiff and Allstate's insured agreed to join forces against Allstate and split the expenses and recovery on stated terms. Their agreement is printed in full at 680 S.W.2d at 609. *It does not say one word about non-execution against the insured's assets.*

Concerning this agreement, Allstate made two arguments. First, it contended that since its insured would recover one-third of any *Stowers* judgment against Allstate, the insured was to that extent his own creditor and this extinguished one-third of Allstate's liability. The court summarized Allstate's second contention as follows:

Allstate further contends that the terms of the agreement give rise to a necessary implication that Kelly [the original plaintiff and judgment creditor] will never attempt to satisfy the judgment by the levy of execution against Alves' [Allstate's insured and the excess judgment debtor] properties.

680 S.W.2d at 610. The court then rejected both arguments:

Both contentions lack merit. The agreement is simple and unambiguous. Under its provision, Alves assigned two-thirds of her cause of action [under *Stowers*] against Allstate to her judgment creditor, Kelly, with an agreement to share certain expenses. This she had a right to do.

*Id.* In view of these facts, *Kelly* cannot govern this case, which involves an express and tightly written covenant not to execute.

and (2) that APIE had caused 16% of Garcia's damages:

SPECIAL ISSUE NO. 33.

What percentage, if any, of the damages found by the Court in Cardenas v. Garcia were proximately caused by the acts or omissions of Dr. Garcia on or after 1/8/83?

Answer by stating the percentage found.

We, the Jury, Answer: __16__%

SPECIAL ISSUE NO. 36.

For each party found by you to have caused damage to Dr. Garcia find the percentage caused by:

| | | |
|---|---|---|
| ICA | 84 | % |
| APIE | 16 | % |
| [Total] | 100% | |

APIE says that under these two jury findings it owes only $357,600, which is 16% of Garcia's damages (the judgment against him for $2.235 million), and that it paid more than its share of the liability when it paid the $500,000. Why doesn't the majority hold simply that the $500,000 was not paid in settlement? Instead it holds that APIE is not entitled to either a 84% reduction of liability or to a dollar credit for the $2.0 million paid by ICA. In other words, under the majority's reasoning, a plaintiff with an injury of $2.235 million could recover $2.0 million from one defendant (who was 84% responsible), and then recover an additional $3.167 million[10] from a defendant that is only 16% responsible! The majority gives two reasons for this holding: (1) ICA's failure to settle, and APIE's failure to defend and settle, "constituted an *indivisible injury* to [Dr. Garcia] that *cannot be apportioned* on a pro rata basis," and (2) "There is *no statutory right* to contribution or indemnity from other defendants for violations of article 21.21.... Therefore, APIE is not entitled to a *credit* for the $2,000,000.00 payment made by ICA" (emphasis added). I would hold that APIE is entitled to one or the other.

In *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 431 (Tex.1984), the supreme court rejected the notion that injuries are "indivisible" and that courts cannot establish percentage comparative causation in product liability cases. As I read *Duncan*, in the absence of a contribution statute, the courts will enforce the one-recovery (or one-satisfaction) rule unless they replace it with a court-created system of comparative responsibility. *Duncan* held that "in multiple defendant cases in which grounds of recovery other than negligence are established, the non-settling defendants' liability and the plaintiff's recovery shall be reduced by the percent share of causation assigned to the settling tortfeasor by the trier of fact." *Id.* at 429.

*Duncan*'s comparative causation scheme applies to product liability cases, but on the issue of multi-party settlements and the one-recovery principle its reasoning applies to this case. The *Duncan* court said that because it was adopting comparative causation in strict liability cases, it would no longer follow the one-recovery rule of *Bradshaw v. Baylor Univ.*, 126 Tex. 99, 84 S.W.2d 703 (1935). The court had reaffirmed that rule in *T.L. James & Co. v. Statham*, 558 S.W.2d 865, 868 (Tex.1977) ("We adhere to the rule ... that a claimant in no event will be entitled to recover more than the amount required for full satisfaction of his damages"), and *McMillen v. Klingensmith*, 467 S.W.2d 193, 196–97 (Tex.1971) (same). According to *Duncan*, the one-recovery rule had its roots in the outmoded idea that "the courts could not conceive of allocating liability. Injuries were considered indivisible...." *Duncan v. Cessna*, 665 S.W.2d at 431. That way of thinking, said the court, no longer applies. "The system of comparative causation we adopt allows allocation of liability between the parties, even when the injury itself is indivisible." *Id.* The court then held that "the one recovery rule does not prevent our adopting a system that reduces the plaintiff's recovery and the non-settling defendants' liability by the percentage of causa-

---

**10.** In this case plaintiffs do not benefit fully from the majority's legal rule because they

agreed to a $2.0 million ceiling on liability.

tion assigned to any tortfeasor with whom plaintiff has settled. We hereby adopt a percent credit rule.... Accordingly, to the extent it conflicts with this opinion, we overrule *Bradshaw v. Baylor University.*" *Id.* at 432.

*Duncan* overruled *Bradshaw* only to the extent that it conflicted with the newly-adopted comparative causation system for product liability cases. In other words, *Bradshaw*'s one-recovery rule still exists in cases where it has not been replaced by a comparative causation scheme. The majority must take its pick and allow APIE either percentage reduction or dollar off-set. If there is no comparative causation in multi-defendant *Stowers* cases, then the one-recovery rule still applies and APIE is entitled to reduce its liability by the amount already received by the plaintiffs. If there is to be comparative responsibility in multi-defendant *Stowers* cases, then APIE is entitled to a judgment that reflects the jury's 84%–16% findings. Under the one-recovery, dollar-credit approach, APIE would owe $235,000 ($2.235 million minus the $2.0 million payment in settlement); under the percentage causation approach, the figure would be $357,600 (16 percent of $2.235 million).

The majority cites *Stewart Title Guar. Co. v. Sterling,* 772 S.W.2d 242 (Tex. App.—Houston [14th Dist.] 1989, writ granted), but that case held only that "there is no *statutory right* to contribution or indemnity from other defendants for violations of article 21.21." *Id.* at 248 (emphasis added). True enough, but neither is there a *statutory prohibition,* and therefore *Bradshaw* still applies in this field. Until the courts create a *Duncan*-style comparative contribution system, which the majority is obviously unwilling to do, we must apply *Bradshaw*'s one-recovery rule.

The majority says that once a judgment is signed an offer to pay the *entire excess judgment* will not relieve the insurer of liability under article 21.21. Apparently under the majority's analysis the insurer risks article 21.21 penalties if it does not pay the excess judgment *before it is signed.* Says the majority,

When the tort alleged is failure to settle, the insurance company's breach occurs at the time of the rejection of a reasonable settlement offer.... When the allegation is failure to defend, the tort is complete at least by the time of the signing of the adverse judgment against its insured. In any case, liability under article 21.21 has attached by the time of the signing of the judgment in the first suit, and an offer to pay that judgment will not absolve the insurer of article 21.21 liability.

These statements are too broad. Payment of the entire judgment plus costs and attorneys fees removes every bit of the insured's harm, and should resolve the case. Yet the majority would allow the plaintiff, acting under an assignment from the insured, to reject an offer to pay the entire excess judgment and related costs and attorney's fees and sue the insurer for statutory and common-law penalties. I agree that a post-trial offer to pay the *policy limits* should not automatically resolve the *Stowers* case. But I think that an offer to pay the *entire excess judgment* plus costs and attorney fees should resolve the *Stowers* case because it erases the underlying judgment completely, and that is all that the insured can complain about. It is non-sense to suggest that my approach gives the insurer no incentive to settle. The insurer's incentive is that if it settles it pays its limits or perhaps less; if it negligently fails to settle, it pays its limits plus the excess.

I am puzzled by another of the majority's holdings. The majority says ICA's payment of $2.0 million was payment for a release of *ICA* in the *Stowers* suit only. Does this mean that if parties recite that the payment is in the second suit it would not reduce the underlying excess judgment against the insured (and presumably would not even be admissible in evidence)? But if the $2.0 million payment has nothing to do with the underlying judgment, and the covenant not to execute does not erase the threat to Garcia's assets, one wonders whether the majority would permit Cardenas to collect the judgment against Garcia. Obviously no one would let that happen, but I am not aware of any legal reason

why not, if the majority is correct that there is still a full judgment for $2.235 million against Garcia notwithstanding the payment of $2.0 million and the covenant not to execute.

The majority cannot have it both ways by holding that in Stowers cases there is no comparative causation *and* no one-recovery rule. That holding cannot be squared with *Duncan v. Cessna*. The majority also errs in making broad and unjustified statements that the insurer cannot pay the entire excess judgment and end the case, and that the $2.0 million payment applies only to the *Stowers* case and not to the malpractice judgment.

## IV. EXCLUSION FROM EVIDENCE OF COVENANT NOT TO EXECUTE AND RECEIPT OF $2.0 MILLION

Even if I am wrong about the effect of the covenant not to execute on the *Stowers* case and APIE's right to percentage contribution or dollar offset, I find it incredible that the covenant not to execute was excluded from evidence along with all reference to the $2.0 million payment by ICA.[11] We must remember that in the *Stowers* suit the plaintiff, Dr. Garcia, was saying, "I am injured by this malpractice judgment against me and I want compensation from APIE." Concerning that contention, APIE sought to show that Garcia did not really suffer damages in the amount of the malpractice judgment ($2.235 million) because it could never cause that much damage to his assets, $2.0 million of it having been paid. I would therefore hold that the court erred in excluding from evidence the covenant not to execute and the fact that Cardenas had been compensated $2.0 million, both of which certainly were relevant to the jury's decision about how much Garcia had really been injured.

The majority reasons that *Allstate v. Kelly*, 680 S.W.2d at 606, held that the insured's damages are fixed as a matter of law by the excess amount of the underlying judgment. *Kelly* does make that statement, but it cannot be true where, in contrast to *Kelly*, there is a covenant not to execute and a partial payment on the judgment by a co-defendant. *Kelly* was cited but not followed on this point in *William M. Mercer, Inc. v. Woods*, 717 S.W.2d 391 (Tex.App.—Texarkana 1986), *affirmed in part and reversed in part on other grounds*, 769 S.W.2d 515 (Tex.1988). In *Mercer* the court of appeals reasoned that the underlying judgment is *some evidence* of damages but it does not establish damages as a matter of law. 717 S.W.2d at 398–401. The court cited *Montfort v. Jeter*, 567 S.W.2d 498, 500 (Tex.1978), which said that the existing excess judgment "is some evidence of actual damages." 717 S.W.2d at 399.

Perhaps Garcia still suffers damages in the form of mental anguish from a judgment that could never threaten his assets but which nevertheless still exists on the books. But the fact remains that his assets are not threatened by the judgment and no evidence of mental anguish was presented. Certainly any threat from the malpractice judgment is reduced by the $2.0 million payment. The jury should at least have been told about the covenant not to execute and the $2.0 million payment, for whatever weight the jury thought appropriate. Because the verdict and judgment before us are obviously based on the theory that the judgment causes Garcia $2.235 million in damages without taking into account the covenant not to execute and the $2.0 million payment, I would at the least reverse and remand for a new trial.

---

**11.** I do not agree with APIE that the court abused its discretion in excluding evidence of its payment of $500,000 to the plaintiffs. In view of the consideration for that payment—a six-month continuance, an agreement that the plaintiffs would oppose a separate trial or severance sought by any of the defense attorneys who had been sued, and a liability cap of $2.0 million in the *Stowers* case—it was not clearly a payment on the underlying judgment.

The $2.0 million payment by ICA is another matter. APIE offered evidence of that payment separately from the evidence of its own payment of $500,000. The court should have admitted evidence of ICA's payment of $2.0 million on the underlying judgment.